UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ROBERT HAYDEN                                           **JURY TRIAL DEMANDED**
    Plaintiff

v.

CITY OF NEW HAVEN
CHIEF ANTHONY CAMPBELL
SERGEANT BURGH
    Defendants

## **COMPLAINT**

I.   **PRELIMINARY STATEMENT**

1. Count One is an action pursuant to Connecticut General Statutes § 31-51q.

2. Count Two, Three and Five are actions pursuant to 42 U.S.C. § 1983.

3. Count Four is a common law action for assault and battery.

II.   **JURISDICTION**

4. Jurisdiction of this Court is invoked pursuant to the provisions of Sections 1331, 1332, 1343(3) and 1367(a) of Title 28 and Sections 1983 and 1988 of Title 42 of the United States Code.

III.   **STATEMENT OF FACTS**

5. During all times mentioned in this action, the Plaintiff was, and still is, an adult Citizen of the United States residing in New Haven, Connecticut.

6. During all times mentioned in this action, the Defendant City of New Haven (hereafter referred to as "City") was an employer, and a Connecticut municipality which, among other things, operates the New Haven Department of Police Services.

7. Plaintiff has been an officer with the City of New Haven Department of Police Service since October 2002.

8. On or about May 22, 2016 Plaintiff was assigned to the "extra duty" unit.

9. The "extra duty" unit is responsible for managing assignments of police officers, detectives, sergeants and lieutenants to assignments in addition to regularly weekly work hours.  These extra duty assignments were for work such as with the traffic division, bar details or other matters.

10. Police Services officers are paid at the overtime rate of pay for extra duty assignments thus these assignments are considered very lucrative.

11. On or about early 2016 it became public knowledge that certain officers in the department were earning very large amounts as a result of the extra duty assignments. Specifically, one officer, Dennis Mastriano, who was I charge of extra duty work assignments, was found to have earned approximately $192,000 in one year despite the fact that his base salary was approximately $ 62,000 per year.

12. An investigation was launched, Mastriano was removed from the position and new persons were assigned to manage the extra duty work unit.

13. Lieutenant Samuel Brown was assigned as the Officer in Charge of the Traffic Unit and Detail Room and asked that Plaintiff be assigned to the "extra duty" unit.

14. The intent of the assignment to the "extra duty" unit of Lieutenant Brown and Plaintiff was to ascertain the causes for what appeared to be excessive wages being paid to public employees in the department of Police Services.

15. After assuming the position in the "extra duty" unit Plaintiff determined that there were inequities in the manner in which "extra duty" assignments were being made.

16. The practice regarding extra duty assignments was supposed to be a rotation system whereby eligibility for extra duty was assigned first to officers, then to detectives, then to sergeants and then to lieutenants.

17. Furthermore assignments were to be made based first on vacation days, days off and then time off.

18. The intent of these rules was to attempt to ensure equal opportunity for department employees to obtain extra pay for extra duty work.

19. Upon being assigned to the "extra duty" unit Plaintiff discovered that the eligibility rules were not being applied equitably and that certain officers were being given favored treatment in the "extra duty" assignments.

20. For example, Sergeant Mark O'Neill, to whom Plaintiff reported, and who in turn reported to Lieutenant Brown, was in charge of the motorcycle unit. Plaintiff discovered that there was a pattern demonstrated that approximately six (6) people who reported to O'Neill were being given favored treatment in the "extra duty" assignments.

21. Plaintiff found that O'Neil was receiving unauthorized jobs in violation of the contract for at least a year and a half.

22. Plaintiff was instructed by Lieutenant Brown to immediately stop most of the people from getting the unauthorized jobs and that the stubborn ones should be weaned off getting extra duty jobs in violation of the union contract.

23. As soon as Plaintiff began the extra duty position and started telling officers that they were not getting unauthorized jobs, they began to attack him.

24. Officers began to remove extra duty pages from the extra duty book, which would cause Plaintiff to violate the contact, and which in turn allowed them to file complaints against Plaintiff. Because Plaintiff was not aware of the pages being missing, he would call from the remaining page logs.

25. On multiple occasions in the past, even prior to Plaintiff being assigned as the extra duty officer, command staff has had to send out an email to Police Services staff reminding them not to remove pages or cross out names from the extra duty logbook.

26. Sergeant O'Neill began telling offices to file complaints regarding the extra duty assignments in retaliation for his own loss of extra duty assignments.

27. On or about July 2016 Sergeant O'Neil and Sergeant Bullock requested Plaintiff's computer password. When he refused to give it to them they became angry and tried to force Plaintiff to give it to them.   Plaintiff accessed to the computer and tried to find out what they were looking for and found it. Plaintiff found that Sergeant Bullock, who was in charge of reporting when someone works over 16 hours, had permitted his best friend Officer Durkin to work a triple that weekend and, upon information and belief, they needed to delete it from Plaintiff's computer to show no trace of it happening.

28.     Officers and Supervisors who Plaintiff found were receiving favored treatment in extra duty assignments included Sergeant O'Neill and Craig Miller, union president.

29.     On or about June 10, 2016 Sergeant Dennis Burgh entered Plaintiff's office while he was standing near his office desk and stated "you better hire me for eight (8) hours, don't call me for four (4) hours, don't ask me if I want anything like Cody's and you better give me a job". Burgh also stated that if Plaintiff did not give him one of those jobs there was going to be trouble.  He stated that he "wanted to work the festival, make it happen kid or you know".   Plaintiff informed Burgh that he was going to continue to use the extra duty list in proper order and would offer him an assignment after the patrol list expired. Burgh was angry and yelling at Plaintiff.

30.     On June 15, 2016 Burgh physically assaulted Plaintiff by intentionally brushing up against him forcing him to try to maintain his balance.  Burgh walked out of Sergeant O'Neill's office as Plaintiff was going in and deliberately brushed against him for a second time.  When Plaintiff instructed Burgh not to touch him again, Burgh again stated "you better give me a job for eight (8) hours." Burgh had demanded to be given the Gateway Community College Job which was an eight hour job.

31.     Sergeant O'Neill witnessed both assaults but did not intervene.  He also informed Plaintiff that he could not tell another sergeant what to do.

32.     As a result of this assault, Plaintiff filed a complaint with Lieutenant Brown. The complaint is still pending.   A written report of these incidents between Plaintiff and Burgh was made to Lieutenant Criscuolo on June 15, 2015 in which Plaintiff complained of a hostile work environment having been created by Sergeant Burgh.  As a result of the

complaint of harassment and hostile work environment, Lieutenant Criscuolo allowed Plaintiff to take time off with pay.

33. While still employed in the extra duty unit and while on the leave with pay that had been allowed because of the harassment and hostile work environment, Sergeant Bullock had Lieutenant Saclare to revoke Plaintiff's privileges to enter the detail room.

34. In another instance Plaintiff was told by Sergeant Burgh that Plaintiff would be required to assign Burgh the extra duty assignment at Gateway Community College whenever he wanted that assignment.

35. Plaintiff informed Burgh that he was not eligible to be assigned as Burgh was demanding and that he would not be assigned the work.

36. Once Plaintiff began equitably applying the eligibility rules for extra duty work assignments, he became the target of harassment from others in the unit.

37. On or about June 2016 Chief Dean Esserman came into the extra duty office and said to Plaintiff "I know you're being harassed, you are more hated than me right now, I will come down here every morning to check on you or send one of my chiefs to check on you".

38. Every morning Esserman would come in and check on Plaintiff and Assistant Chief Campbell would also come.  When Campbell did not come, police commissioner Greg Smith would also come in to check on Plaintiff as well).

39.     For example, on or about June 17, 2016 Sergeant O'Neill entered Plaintiff's office and others in the unit would wait until Lieutenant Brown was on an off day and would come and yell in Plaintiff's ear questions such as "what did you do today"?

40.     On or about June 2016 Plaintiff informed then Sergeant M. Colon that he was uncovering violations in the extra duty unit and that he was being harassed.

41.      Lieutenant Colon worked for Internal Affairs and Assistant Chief Cain. Colon had a responsibility to report the information to Cain and did so.

42.     On or about June 2016 Assistant Chief Cain came to Plaintiff and asked what information he had regarding Dennis Mastriano stealing money.  However Cain did not ask this in a manner of someone simply requesting information but instead asked her question in a yelling manner.

43.     During Plaintiff's first two weeks on the extra duty job  Dennis Mastriano stated to Plaintiff that he was getting jobs and he was hooking up people with jobs.   He stated however that when all of this investigation happened they all turned their backs on him, referring to O'Neil and the union.

44.     Sergeant O'Neill, Plaintiff's direct supervisor, had been instructed by Lieutenant Brown to train Plaintiff on how to effectively perform his job, however he never did train Plaintiff.

45.     After approximately six (6) weeks on the job, Plaintiff was required to make a written complaint to Lieutenant Brown that his immediate supervisor, Sergeant O'Neill was failing to provide him with any training and appeared to be doing everything possible to undermine Plaintiff's job performance.

7

46.     On September 27 Plaintiff met with Chief Generoso who informed him that he would be removed from the assignment in the "extra duty" unit effective October 16, 2016. He was informed by Chief Generoso that the reason was its "just not working out".

47.     Plaintiff stated in writing to Chief Generoso on September 29, 2016 that it was not his desire to be transferred out of the extra duty unit that his complaint of workplace violence had gone unaddressed, and that only minority officers/supervisors had been transferred out of the unit.

48.     Plaintiff had been providing proof to Lieutenant Brown of what was going on with unauthorized extra duty assignments.  Defendant City of New Haven Police Services transferred the only three black officers in the unit (i.e. Lieutenant Brown, Officer Cargill and Plaintiff.

49.     Plaintiff was not given the contractually require two week notice prior to being transferred.

50.     Plaintiff filed a grievance regarding not being given timely notice of transfer and that they had taken away his privileges to enter the detail room.

51.     Plaintiff was informed that Sergeant O'Neil was also being transferred, however this did not happen for weeks. Plaintiff repeatedly asked why Sergeant O'Neil was being allowed to remain in the extra duty room but got no definitive answer.  After several weeks Defendant transferred Sergeant O'Neill but was later returned to the extra duty office when the union fought for his return.

52. On October 4, 2016 Plaintiff informed Chief Generoso in writing that since complaining regarding Sergeant Bullock, Bullock had rescinded a previously approved day off (i.e. October 23). Bullock had approved the day off on September 30.

53. Sergeant Bullock engaged in further harassment of Plaintiff when he began checking the portable radios of those officers who were friends of Plaintiff in an attempt to say that Plaintiff had given his radio to them. Bullock was stating to associates of Plaintiff, that he "heard a rumor that they were given a new radio." Plaintiff complained of this harassment in a written memo to Chief Generoso.

54. Plaintiff spoke with multiple people within the Department and the Board of Police Commissioners (hereafter "BPC") regarding his conclusion that the extra duty work assignments were not being equitably given to employees and that certain employees were being given favored treatment that allowed them to obtain lucrative overtime pay.

55. Plaintiff spoke with Greg Smith, a member of the BPC on at least ten (10) occasions about the favoritism that was occurring with the extra duty assignments. He informed Smith of the misuse of the system by certain members of the department and the favoritism. As recently as June 17, 2018 Plaintiff spoke by telephone with Smith regarding this matter.

56. On each occasion Smith would state that he would take some action on the matter that was being reported by Plaintiff. However, to Plaintiff's knowledge no such action has ever been taken.

57. When Plaintiff was first assigned to the extra duty unit, Smith was one of the people who advised Plaintiff that he should clean up the situation in the unit.

58. In addition to Smith, Plaintiff spoke with the following persons regarding the favoritism: Esserman, Campbell, Lieutenant Brown, Lieutenant Criscuolo, Craig Miller (union president) and Daryl Jones, Supervisor at City Hall who is in charge of extra duty pay slips.

59. On September 2, 2016 Plaintiff complained verbally and in writing to Chief Campbell regarding the hostile work environment that was being created by Sergeants O'Neill and Bullock, including their verbal and physical assaults on him.

60. On or about October 25, 2016 Plaintiff filed a grievance stating that it was "based on black officers being the primary officers removed from the detail room (extra duty office). Plaintiff also filed a grievance alleging that he was subject to a hostile work environment created by Sergeant Mark O'Neill.

61. In October 2016 Plaintiff filed a complaint with the Commission on Human Rights & Opportunities. The complaint was filed with the whistleblower division of CHRO. Though it was dismissed for lack of jurisdiction, the department was aware of the complaint.

62. In his complaint Plaintiff had complained that all of the African-American employees in the extra duty unit were discriminatorily removed from their positions. This included Lieutenant Brown and Darryl Cargill.

63. On December 4, 2016 Chief Campbell ordered that an Internal Affairs investigation be conducted on Plaintiff regarding hiring practices during his brief assignment to the extra duty unit.

64. The investigation reached the contrived conclusion that Plaintiff had violated the standard operating procedures and the union contract regarding extra duty work assignments. The investigation report also claimed that the action of Plaintiff t to the extra duty assignments had lowered the morale among officers in the department.

65.. On September 7, 2017 Plaintiff was ordered by Chief Anthony Campbell to report to the Board of Police Commissioners for a hearing on his alleged violation of General Order 1.03, Rules of Conduct, Section 1.03.12, Article 2 and Article 3.

66. The allegations of misconduct made against Plaintiff were as a direct result of his strict adherence to the standard operating procedures for the assignment of extra duty work.

67. Plaintiff has been given a fifteen (15) day unpaid suspension.

68. On April 11, 2018 an Internal Affairs Investigation report was issued by Lieutenant Rose Dell.

69. The IA investigation concluded that Plaintiff had allegedly violated General Order 400 regarding patrol operations, General Order 8.07 regarding evidence/property storage and handling, and General Order 10.01 regarding incident reports.

70. The incident that formed the basis for this IA investigation was a routine apprehension by Plaintiff of a suspect who was under the influence of some kind of intoxicating substance.

71. The underlying incident had occurred on May 27, 2017 by a landlord who alleged neglect of duty by Plaintiff. The complaint was made on or about August 27, 2017.

72.   Prior to the April 11, 2018 IA report Plaintiff had never previously in his sixteen (16) year career with the New Haven Police been the subject of an IA investigation or been found guilty of violation of any department General Orders.

73.   The allegations of misconduct made against Plaintiff and the decision to find him guilty by Internal Affairs were as a direct result of his strict adherence to the standard operating procedures for the assignment of extra duty work.

74.   Defendant used the claim that Plaintiff had crossed out the names of individuals in order to give extra duty assignments to whom he wanted to. This claim was a pretext for discrimination and retaliation.

75.   Chief Campbell stated to Plaintiff that, based on the information provided to him by Internal Affairs, he was recommending that Plaintiff be suspended for thirty (30) days.

76.   When Plaintiff asked why he was being suspended when Campbell knew that anybody could have crossed out names because there was no accountability for the logs. Campbell stated that though this was true, he had to look at the overall morale of the department.

77.   Campbell then offered to lower the suspension to twenty (20) days based on what Plaintiff said to him. He later lowered the number of days of suspension to fifteen (15). A department employee has no right to bring their case before the Board of Police Commissioners if the disciplinary suspension is fifteen days or less.

78.   Plaintiff told Chief Campbell "no thank you, and his only crime is that he stood up against a corrupt group of officers."

12

**COUNT ONE:**     **CONNECTICUT GENERAL STATUTES SECTION 31-51Q**

1 -78.   Paragraphs 1-78 are incorporated by reference and made paragraphs 1 – 78 of this Count One.

79.     By making complaints both within and outside the Department of Police Service, Plaintiff was engaged in protected speech on a matter of public concern.

80.     By transferring Plaintiff out of the extra duty work unit, permitting him to work in a hostile work environment, causing him to be subjected to an internal affairs investigation, and suspending him for fifteen (15) days, Defendant has retaliated against Plaintiff for engaging in protected speech on a matter of public concern.

81.     By engaging in the protected conduct regarding matters of public concern, Plaintiff did not materially or substantially interfere with his employment relationship.

82.     Plaintiff has been damaged thereby.


**COUNT TWO**     **42 U.S.C. § 1983 (RETALIATION) (As to Chief Anthony Campbell)**

1 -78.   Paragraphs 1-78 are incorporated by reference and made paragraphs 1 – 78 of this Count Two.

79.     This is an action to redress the deprivation of rights secured to the plaintiff by the Constitution and laws of the United States and the State of Connecticut. The defendant, acting through its highest policy-setting officials for the matters in question, retaliated against the plaintiff for having exercised rights protected by the First Amendment to the

United States Constitution and by Article First, Sections Three, Four and Fourteen, of the Connecticut Constitution..

80.     By making complaints both within and outside the Department of Police Service, Plaintiff was engaged in protected speech on a matter of public concern.

81.     By transferring Plaintiff out of the extra duty work unit, permitting him to work in a hostile work environment, causing him to be subjected to an internal affairs investigation, and suspending him for fifteen (15) days, Defendant has retaliated against Plaintiff for engaging in protected speech on a matter of public concern.

82.     As a result, the plaintiff has suffered economic losses and emotional distress.

83.     The actions of the defendant described above constituted retaliation against the plaintiff for exercising free speech rights secured to him by the First Amendment to the United States Constitution and by Article One, Sections Three, Four and Fourteen, of the Connecticut Constitution.

84.     Plaintiff has been damaged thereby.

**COUNT THREE**     **42 U.S.C. § 1983 (HOSTILE WORK ENVIRONMENT) (As to Chief Anthony Campbell)**

1 -78. Paragraphs 1-78 are incorporated by reference and made paragraphs 1 – 78 of this Count Three.

79.     By his knowledge of, and acquiescence to, the conduct of officers and supervisors yelling, assaulting, intimidating and threatening Plaintiff, Chief Campbell permitted the creation and maintenance of a hostile work environment because of Plaintiff's strict

adherence to standard operating procedures regarding extra duty work and because he complained of the racially discriminatory transfer of staff from the extra duty unit..

80. Because of the hostile work environment that was created and permitted to exist, Plaintiff was hindered in his ability to properly perform his job duties.

81. Plaintiff was damaged thereby.

**COUNT FOUR       ASSAULT AND BATTERY (As to Sergeant Dennis Burgh)**

1 -78. Paragraphs 1-78 are incorporated by reference and made paragraphs 1 – 78 of this Count Four.

79. By the conduct alleged in paragraph 30 Sergeant Dennis Burgh engaged in a harmful and offensive touching of the physical person of Plaintiff.

80. Plaintiff was damaged thereby.

**COUNT FIVE       42 U.S.C. § 1983 (RACIAL DISCRIMINATION) (As to Chief Campbell)**

1 -78. Paragraphs 1-78 are incorporated by reference and made paragraphs 1 – 78 of this Count Five.

79. Plaintiff's speech was protected by the First Amendment as it would be fairly characterized as constituting speech on a matter of public concern.

80. Plaintiff's speech concerning defendant's operation of the extra duty unit was made based on his interest as a citizen to comment on matters of public concern and did not conflict with expected interest of his employer in promoting the efficiency of the police services provided by Defendants.

81. Plaintiff also spoke out regarding what he reasonably believed to be the racially discriminatory treatment of African American staff assigned to the extra duty unit when they were all transferred out of that unit.

82. Plaintiff has been damaged thereby.

**WHEREFORE**, Plaintiff prays that the Court grant such relief as may be deemed appropriate, including but not limited to:

(a) Compensatory damages;

(b) Attorney's fees and costs       ;

(c) Such other equitable remedies as the court deems proper.

(d) Punitive damages pursuant to C.G.S. § 31-51q.

## **JURY DEMAND**

Plaintiff hereby demands a jury trial on all issues.

FOR THE PLAINTIFF

By:    /S/ Josephine S. Miller
Josephine Smalls Miller, FED BAR # ct27049
152 Deer Hill Avenue, Suite 302
Danbury, CT 06810
Tel: (203) 512-2795
Fax: (203) 702-5188
Email: jmillerlaw@sbcglobal.net